641 P.2d 1317

**LINCOLN PROPERTY COMPANY; Lincoln Associates, Inc., a Texas corporation; Lincoln Eltusar Associates, a Texas Limited Partnership; Lincoln Arizona Associates, an Arizona Limited Partnership, and Lincoln Portusap Associates, an Arizona Limited Partnership, Plaintiffs/Appellants,**

v.

**CITY OF TUCSON, a municipal corporation of the State of Arizona, Defendant/Appellee.**

**No. 2 CA–CIV 3946.**

Court of Appeals of Arizona, Division 2.

Jan. 19, 1982.

Rehearing Denied Feb. 24, 1982.

Review Denied March 16, 1982.

Snell & Wilmer by Edward Jacobson and Richard K. Mahrle, Phoenix, for plaintiffs/appellants.

Frederick S. Dean, Tucson City Atty. by Louise B. Stratton, Tucson, for defendant/appellee.

OPINION

HATHAWAY, Judge.

Lincoln Property Co. [L.P.] has appealed from a judgment entered against it in its suit for refund of Tucson business privilege taxes paid under protest. The matter was submitted to the trial court on a fact stipulation and cross-motions for summary judgment. The issues on appeal, as framed by appellants, are:

1. Whether it was proper for the City of Tucson to apply its business privilege tax on "contracting" to the non-contracting activities of L.P. outlined in the fact stipulation.

2. Whether the privilege tax on contracting also included speculative builders.

L.P. is the name used by a group of developers to identify a family of affiliated business entities that purchase land, develop plans for its use, secure construction and permanent financing for the development, build according to the plans and secure equity investors to participate in the development.

Four L.P. developments in the Tucson area are involved in the instant case. One is an office park called Lincoln Financial Park and the other three are apartment complexes.

The plan of development begins with the location of desirable, undeveloped property, which is purchased and for which development plans are thereafter formulated. L.P. then searches for equity investors, using an independent brokerage firm in New York. Limited partnerships are created with these investors, usually prior to the commencement of construction. (In the case of Willowick I, one of the apartment complexes, construction began before execution of the limited partnership agreement.) The developers constituting L.P. serve as the general partners and the equity investors serve as the limited partners. L.P. undertakes the completion of the development. When the development is finished, it is conveyed to the limited partnership, at which time the general partners are reimbursed for the construction costs and all other expenses incurred in the development.

L.P. contends that the reimbursed activities are non-contracting activities and, thus, are not taxable. The City of Tucson argues that these are contracting activities and are taxable. The activities in question are set out at paragraph 22 A–C of the fact stipulation as follows:

"A. Financing Costs.

(1) Loan Fees (points): LP was reimbursed by the limited partnerships for points paid to Western Savings and Loan Association and IDS Mortgage Company as part of the cost of securing financing to develop the property. These loan fees were incurred prior to the commencement of construction.

(2) Interest: LP was reimbursed by the limited partnerships for interest paid to various financial institutions for interim loans and permanent financing during and at the termination of the construction of the projects.

(3) Brokers Fees: LP was reimbursed by the limited partnerships for brokers fees paid to Eastdil, a division of Eastdil, Blythe, Eastman, Dillon and Co., an independent broker, as sales commissions for the placement of equity interests with the limited partners.

B. Outside Design Services.

(1) Architectural and Engineering Costs: LP was reimbursed by the limited partnerships for fees paid to independent firms prior to construction, financing and, in most cases, even prior to the acquisition of the land.

(2) Survey Fees: LP was reimbursed by the limited partnerships for survey fees paid to an independent civil engineer prior to the acquisition of the land.

(3) Construction Analysis Fee: LP was reimbursed by the limited partnership for $1,000 of fees paid, prior to the development of Willowick I, to Control Data Corp., an independent firm, to estimate the costs of construction.

C. Other.

(1) Advertising for Rent: These amounts were paid to outside agencies for billboard rentals and newspaper advertising of the apartments and for designing sales presentation materials for the renting of Lincoln Financial Park.

(2) Travel and Automotive: LP was reimbursed by the limited partnerships for its travel and automotive expenses, substantially all of which charges represent payments made to travel agencies for expenses incurred by the original developers while they were seeking out properties worthy of development. These costs were incurred prior to the purchase of the land.

(3) Legal Fees: LP was reimbursed by the limited partnerships for the fees it paid to independent law firms for legal

services required to prepare and process closing papers for the purchases of the real estate, loan documents and instruments of sale for equity interests in the limited partnerships.

(4) Appraisal Fee: LP was reimbursed by one limited partnership for the fee it paid to an independent real estate appraiser to appraise one of the properties (Lincoln Financial Park). This was required to secure financing.

(5) Developer Fee: LP was paid a fee for its non-construction functions. These included searching for and obtaining the lands, designing the projects, obtaining both construction and permanent financing and soliciting and obtaining equity investors to take over the project into the limited partnerships. (Fees received by LP for its construction functions have been treated by the parties hereto as taxable if the Court determines that LP is taxable as a Contractor).

(6) Soil Test: LP was reimbursed by the limited partnerships for fees it paid to an independent engineering firm (Engineering Testing Laboratories) to perform soil tests on each property prior to and as a condition of the acquisition of the land. This was done for the purpose of seeing whether the land was suitable for development."

In April 1978, the city sent four tax assessments to L.P. for business privilege taxes allegedly accruing during the period August 1973 through June 1976. The assessments were: Lincoln Financial Park, $26,540.35; Willowick I, $5,128.32; Willowick II, $23,978.88; and Los Arboles, $21,595.23. The city's position is that all monies received by L.P. from the limited partnerships were gross receipts from the business of contracting and therefore taxable pursuant to its Business Privilege Tax Code, § 19–83. The city took the further position that although L.P. had no contract when construction began on Willowick I, speculative builders were included in the definition of contractor in the ordinance.

The tax was paid under protest, L.P. contending that it could not be taxed as a contractor for the funds received through activities set out in the fact stipulation. Additionally, L.P. asserted that it was a speculative builder and not a contractor as to the Willowick I project, and thus not subject to the contracting tax. We affirm the trial court's summary judgment granted to the city.

The Official Rules and Regulations for Administration of Business Privilege License Tax defines "contractor" in the following language:

"The term 'contractor' includes sub-contractors, specialty contractors, *developers, and speculative builders.*" (Emphasis added)

*Id.,* part II.B.15.(a). In addition, the regulations prohibit the contractor from deducting certain costs:

"Costs of Services not Deductible. A contractor may not deduct from his gross proceeds or gross income the costs of services rendered by administrative officers, office employees, a general superintendent, or supervisors not performing the duties of a foreman, or fees paid to architects, to surveyors in preparing ground work, to engineers preparing plans and specifications, or to architects or engineers in checking and estimating the progress of the work on the contract."

*Id.,* part II.B.15.(i). If the rules and regulations apply to L.P., then all of the expenses listed in the fact stipulation must be included in the gross volume of L.P.'s business and will be subject to the business privilege tax. *See Industrial Uranium Co. v. State Tax Commission,* 95 Ariz. 130, 387 P.2d 1013 (1963).

L.P. argues, however, that the rules and regulations cannot apply, because taxing legislation cannot be broadened by administrative fiat.

We agree with the city that there is a crucial distinction in this case, as the rules and regulations defining "contractor" were adopted by the mayor and council by resolution and with exactly the same procedures used to adopt an ordinance. The Tucson business privilege tax was first imposed by Ordinance No. 1850 on August 18, 1958. The ordinance included the following at § 5:

"The City Tax Collector is hereby authorized and directed to formulate rules and regulations and prescribe forms and procedures necessary to the efficient enforcement of this Ordinance; when approved by the Mayor and Council, *such rules and regulations, forms and procedures, shall be binding upon and obeyed by all persons taxed by this Ordinance,* after three (3) copies of any such rules and regulations shall have been filed in the office of the City Clerk and there kept for the use of any such taxpayer and the public at any time during regular office hours of that office. A printed copy of all rules and regulations shall be furnished any person taxed by this Ordinance upon request." (Emphasis added)

The rules and regulations formulated pursuant to this ordinance were subsequently adopted by reference by the mayor and council in resolution # 3906.

█ The procedure utilized in adopting the rules and regulations in the ordinance was proper and finds precedential support in *City of Tucson v. Stewart,* 45 Ariz. 36, 40 P.2d 72 (1935), where an ordinance was recognized as adopting by reference the provisions of an electrical code. In the instant case, the financial director of the City of Tucson formulated the rules and the city adopted them into the ordinance. This procedure was approved in *Taplick v. City of Madison Personnel Board,* 90 Wis.2d 500, 280 N.W.2d 301 (1979), reversed on other grounds, 97 Wis.2d 162, 293 N.W.2d 173 (1980), where an ordinance directed the personnel board to formulate rules and regulations for the administration of the city's civil service system. Thereafter, the rules and regulations were adopted by resolution. The court stated:

"Petitioner argues that the personnel board cannot establish rules which limit or withhold rights granted by city ordinances. Were the revised rule a product of the unilateral action of the board, we might be inclined to agree with this contention. Under the ordinance, however, the board is not empowered to adopt rules, but only to 'formulate' them. The power to enact them resides in the council.

In considering a Milwaukee ordinance which empowered a city board to adopt rules subject to the approval of the common council, the Wisconsin Supreme Court held that the council's approval had the effect of incorporating the rules into the body of the ordinance. *State ex rel. Milwaukee v. Milwaukee ER&L Co.,* 144 Wis. 386, 393, 129 N.W. 623, 626 (1911). In that case the court said:

'The rules adopted by the board of public works having been ratified and approved by the common council, they became to all intents and purposes part and parcel of the ordinance passed by the common council . . . and really make it complete.' " 280 N.W.2d at 304.

█ Likewise, here we find that the ordinance adopted by reference the rules and regulations formulated by the finance director. Thus, those rules and regulations became part of the ordinance. The extended definition of "contractor," therefore, includes appellants, who do not argue that they are not developers or speculative builders.

L.P. believes that a line of Arizona authority controls this case, citing *State Tax Commission v. Holmes & Narver, Inc.,* 113 Ariz. 165, 548 P.2d 1162 (1976); *Ebasco Services Inc. v. Arizona State Tax Commission,* 105 Ariz. 94, 459 P.2d 719 (1969); and *Dennis Development Co., Inc. v. Department of Revenue,* 122 Ariz. 465, 595 P.2d 1010 (App.1979). We believe these cases to be inapposite. Although they interpret the state business privilege tax, which is similar to the Tucson ordinance, that statute did not define "contractor" to include developers and speculative builders, as does the Tucson City Code.

Affirmed.

HOWARD, C. J., and BIRDSALL, J., concur.