712 P.2d 944

CITY OF PHOENIX, a municipal corporation, Plaintiff-Appellant,

v.

WEST PUBLISHING COMPANY, a foreign corporation, Defendant-Appellee.

No. 1 CA–CIV 6716.

Court of Appeals of Arizona, Division 1, Department C.

Sept. 17, 1985.

Review Denied Jan. 14, 1986.

Andy Baumert, City Atty. by Philip M. Haggerty, Asst. City Atty. for plaintiff-appellant.

Lee, Theisen & Eagle by David W. Eagle, Lawrence J. Lee, Phoenix, for defendant-appellee.

BROOKS, Judge.

This appeal involves an attempt by the City of Phoenix (City) to impose its privilege license tax on West Publishing Company (West). A number of issues and cross-issues are raised, but only one need be addressed as it is dispositive of this appeal.

We find West's activity within the City to be insufficient to establish the necessary constitutional nexus justifying imposition of the tax in question. We therefore affirm the judgment entered by the trial court.

## FACTS AND PROCEDURAL HISTORY

West is a Minnesota corporation involved in the publication and sale of legal books and periodicals, including the Arizona Revised Statutes. Its editorial offices, manufacturing plant, warehouses and shipping facilities are all located in St. Paul, Minnesota. None of West's sales are channeled through a wholesaler or distributor. All orders are filled from West's inventory in St. Paul and shipment of publications are made directly to the subscribers by common carrier or by United States mail. Title and possession passes to the subscribers upon delivery of the publications to the common carrier or to the mail service in St. Paul. *See Salt River Project v. City of Phoenix,* 132 Ariz. 337, 645 P.2d 1251 (App. 1982).

West markets the bulk of its products by direct mail which is conducted solely and exclusively in St. Paul. It also employs 107 sales representatives scattered throughout the United States who solicit and transmit orders to St. Paul for acceptance.

West does not own or lease an office or other facility in Arizona nor does it maintain an inventory in this state. The West representative assigned to Arizona since 1955 is Mr. Arthur Grucky, who conducts business out of his home in the City of Phoenix. Grucky is compensated solely on a commission basis and is personally responsible for his operating and overhead expenses. In this regard, he also pays his own telephone expenses and lists himself in the classified (yellow) pages of the telephone directory under "Law Books" as the "West Publishing Sales Representative". Grucky has only one function, that of seeking orders and answering questions relative to West's products. He has no authority to bind West to any particular contract as all orders and applications for credit must be approved in St. Paul. He does not receive payments on orders nor does he collect delinquent accounts or make adjustments in case of complaints by customers. During the period of time at issue in this appeal, only approximately twelve percent of West's gross sales in the City of Phoenix resulted from Grucky's solicitation efforts. The balance of the transactions were conducted by direct mail between West and its subscribers.

The City of Phoenix imposes a privilege license tax on various forms of business activity conducted within its city limits. At the time of the imposition of the tax at issue, Art. I § 14–2 of the City Code provided, in relevant part, as follows:

Section 14–2 Imposition of Tax; tax-schedule

There is hereby levied upon persons on account of their business activities within the City and shall be collected by the Collector for the purpose of raising revenue to be used in defraying the neces-

sary expenses of the City, privilege taxes to the extent hereinafter provided, to be measured by the gross sales or gross income of persons, whether derived from residents of the City or not, or whether derived from within the City or from without, and all of said gross sales or gross income shall be used to measure the tax with exceptions as set forth in Subsections (b) and (d) of this Section, and in Section 14–40 and Section 14–41 or the Phoenix City Code in accordance with the following schedule:

(a) An amount equal to one percent of the gross proceeds of sale or gross income from the business upon every person engaging or continuing within the City in the following businesses:

\*   \*   \*   \*   \*   \*

(8) Selling any tangible personal property whatsoever at retail, except bonds and stocks and the sale of drugs on the prescription of a member of the medical, dental or veterinarian profession who is licensed by law to administer such drugs.

In 1978, the City audited West's sales. Because of difficulties involved in its attempts to retrieve certain information, the City auditors estimated the dollar volume of all sales to Phoenix customers. The City Treasurer used this estimated sales figure to assess a privilege tax in the amount of $109,196.36 for January 1956 through January 1979, together with interest in the sum of $45,914.74 and penalties amounting to $22,470.28, for a total of $177,581.38. Information later provided caused the City to reform its sales estimate thereby reducing the tax claimed to $83,-949.00, with interest in the sum of $57,-237.00 and penalties of $19,538.00, for a total of $160,724.00. After the assessment was imposed, West invoked the administrative appeal process of the Phoenix City Code [1] by filing its tax protest. Following a hearing, the hearing officer concluded, in part, as follows:

1. Sales orders received by West's Phoenix sales representative are subject to the City's privilege tax;

2. The statute of limitations adopted in the City Code [Art. I, § 14–44.1] limits collection of the tax, and for the period in which the Code did not have a statute of limitations, the State of Arizona limitation provisions apply;

3. The penalties under City Code [Art. I § 14–19(c)(d)(e) and 14–16] were not shown to be appropriate and were thereby waived.

After the hearing officer issued his decision, the City commenced an action in superior court seeking recovery of the full amount of the taxes pursuant to the assessment imposed prior to the administrative review, including interest and penalties.[2] Following a trial to the court, the trial court found that imposition of the City's privilege license tax on West violated the due process clauses of the United States and Arizona Constitutions [3] and also constituted an unreasonable burden on interstate commerce in violation of Art. I, § 8, cl. 3 of the United States Constitution. Although no findings of fact or conclusions of law had been formally requested, the trial court made limited findings and concluded that:

[t]he City of Phoenix' only contact with West is the fact that Mr. Grucky has chosen to locate his home in the City of Phoenix; that during the years that he was covering the entire state, he could have just as well chosen to live in Scottsdale, Mesa, or in an unincorporated portion of Maricopa County....

The trial court entered judgment in favor of West and this appeal followed.

### LEGAL ANALYSIS

Prior to a consideration of the dispositive issue in this case, it is necessary to clarify the nature of the tax sought to be imposed.

It is undisputed that the tax assessed by the City is a business privilege tax which is

---

1. City Code Art. I, § 14–29.

2. City Code Art. I, § 14–29.

3. U.S. Const. Amend. XIV, § 1; Ariz. Const. art. II, § 4.

an exaction for the privilege of doing business within the City limits. This is to be distinguished from a sales tax, which is generally added to the selling price and is borne by the consumer, with the vendor being made an agent of the taxing authority for purposes of collection. Also to be distinguished is a use tax which is complementary to the sales tax and is also borne by the consumer. The use tax is designed to reach out-of-state purchases made by residents within the local jurisdiction. In appropriate circumstances, the out-of-state vendor can be required to collect and remit the use tax in the same manner as if the sale had been consummated within the local jurisdiction. Thus the tax which the City seeks to impose in this case is not a use tax, which would be ultimately paid by the consumer, but a privilege license tax to be imposed *directly* upon West, as the vendor.

■ A business privilege tax, measured by gross sales arising from such business activities, offends due process unless the activities of the taxpayer have established a sufficient nexus within the taxing jurisdiction. The crucial test is "whether the state [or city] has given anything for which it can ask return." *Standard Pressed Steel Co. v. Wash. Dept. of Rev.*, 419 U.S. 560, 561, 95 S.Ct. 706, 708, 42 L.Ed.2d 719, 722 (1975); citing *Wisconsin v. J.C. Penney Co.*, 311 U.S. 435, 61 S.Ct. 246, 85 L.Ed. 267, 130 L.R.A. 1229 (1940).

■ A tax sought to be imposed directly upon the vendor/taxpayer, such as the business privilege tax sought to be imposed by the City in this case, is viewed more carefully and critically than are use taxes, which merely inflict the administrative burden of collection upon the vendor. In *Norton Co. v. Ill. Dept. of Rev.*, 340 U.S. 534, 71 S.Ct. 377, 95 L.Ed.2d 517 (1950), the Supreme Court set forth the following standard:

> Where a corporation chooses to stay at home in all respects except to send abroad advertising or drummers to solicit orders which are sent directly to the home office for acceptance, filing, and

delivery back to the buyer, it is obvious that the state of the buyer has no local grip on the seller. Unless some local incident occurs sufficient to bring the transaction within its taxing power, the vendor is not taxable. (Citation omitted.) *Of course, a state imposing a sales or use tax can more easily meet this burden, because the impact of those taxes is on the local buyer or user....*

340 U.S. at 537, 71 S.Ct. at 380. (Emphasis added.) *See also McLeod v. Dilworth*, 322 U.S. 349, 64 S.Ct. 1030, 88 L.Ed. 1319 (1944).

■ West is licensed by the State of Arizona for the purpose of collecting and paying a use tax, but it has never acknowledged an obligation to pay a business privilege tax to the State or any of its political subdivisions. We conclude that the nature and quantity of West's activity in the City of Phoenix, as above described, are not sufficient to provide the requisite constitutional nexus for the tax sought to be imposed.

The authorities relied upon by the City are factually distinguishable. For example, in *Field Enterprises Inc. v. State of Washington*, 47 Wash.2d 852, 289 P.2d 1010, *aff'd.*, 352 U.S. 806, 77 S.Ct. 55, 1 L.Ed.2d 39 (1956), a Delaware corporation, with its principal office in Chicago, was engaged in the business of publishing and selling encyclopedias throughout the United States. However, it maintained a division office in Seattle with a division manager and four employees. This office was used as a headquarters to train salesmen and there were 175 salesmen within the state. Based upon these facts, it was held that the tax upon the gross receipts from sales in Washington did not impose an unconstitutional levy upon interstate commerce.

The City also relies on *Norton Co. v. Ill. Dept. of Rev., supra*, wherein the taxpayer was a Massachusetts manufacturer of machines and supplies with a branch office and warehouse in Chicago. In addition to receiving orders which were forwarded to the home office for acceptance, however,

the Chicago place of business also performed a number of other functions. It carried an inventory of approximately 3,000 most frequently purchased items from which it served cash customers and those whose credit the home office had approved. For many of the Illinois customers, the Chicago office also acted as an intermediary to reduce freight charges by receiving and redistributing carload lots of goods. In addition, it serviced equipment after sale and stood ready to receive complaints and give engineering and technical advice. On these facts, the tax was upheld.

*Complete Auto Transit v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326, (1977), is also distinguishable. There the Supreme Court held that a Mississippi tax on "the privilege of doing business" was not per se unconstitutional under the commerce clause merely because it was applied to an activity that was part of interstate commerce. In that case, however, the court was careful to note that no claim had been made that the activity was not sufficiently connected to the state to justify the tax or that the tax was not fairly related to benefits provided to the taxpayer.

*Standard Pressed Steel Co. v. Wash. Dept. of Rev., supra,* is closer on its facts but is also readily distinguishable from the instant case. Standard, a manufacturer of industrial and aerospace fasteners, had its home office and one manufacturing plant in Pennsylvania and another plant in California. Standard's only employee in the State of Washington was an engineer whose office was in his home and who primarily consulted with the Boeing Company concerning its use of fasteners. Standard's out-of-state offices handled all sales orders, shipments, negotiations and payments. Washington imposed its business and occupation tax upon Standard's gross receipts from the sale of the fasteners to Boeing. In upholding the constitutionality of the tax, the Supreme Court noted that Boeing was Standard's principal customer in the State of Washington and the court cited the findings of the Washington Board of Tax Appeals that "the activities [of Standard's employee] were necessary to [Standard] in making it aware of which products Boeing might use, in obtaining the engineering design of those products, in securing the testing of sample products to qualify them for sale to Boeing, in resolving problems of their use after receipt by Boeing, in obtaining and retaining good will and rapport with Boeing personnel, and in keeping the invoicing personnel of [Standard] up to date on Boeing's lists of purchasing specialists or control buyers." Id. 419 U.S. at 561, 95 S.Ct. at 708. The court also noted that Standard's agent in Washington was an engineer whose primary duty was to consult with Boeing regarding its anticipated needs and requirements for aerospace fasteners and to follow up any difficulties in the use of Standard's products after delivery. Further, and importantly, the employee was assisted by a group of engineers of Standard who visited Boeing approximately three days every six weeks. Thus Standard's activities in the State of Washington were numerous and substantial thereby supplying the requisite nexus.

The City also relies on *West Publishing Co. v. McColgan*, 27 Cal.2d 705, 166 P.2d 861, aff'd., 328 U.S. 823, 90 L.Ed. 1603, 66 S.Ct. 1378 (1946). The tax imposed against West by the State of California in that case, however, was a tax on net income, as distinguished from a tax on the privilege of engaging in business. Further, contrary to the instant case, West's California employees were authorized to receive payments on orders taken by them, to collect delinquent accounts and to make adjustments in case of complaints by customers. The employees also maintained an inventory of books in the offices of certain attorneys in return for West's use of space in those offices.

Finally, the City relies heavily on *National Geographic Society v. California Board of Equalization*, 430 U.S. 551, 97 S.Ct. 1386, 51 L.Ed.2d 631 (1977). That case, however, involved California's imposition of a "use-tax-collection liability" on National Geographic (seller) which was measured by mail-order sales to California residents. National Geographic maintained

two offices in California that solicited advertising copy for the seller's magazine. The United States Supreme Court affirmed the decision of the Supreme Court of California which sustained the assessment. The court held that the activities of National Geographic's two offices provided a sufficient nexus between the seller and California, where the seller's two California offices solicited advertising copy sales which aggregated approximately one million dollars annually. We note, however, that this case differs from the instant case in that National Geographic itself operated the California offices. More importantly, however, the obligation imposed was a "use-tax-collection liability" rather than a direct tax on National Geographic. The case therefore, is not controlling. *See Norton Co. v. Ill. Dept. of Rev., supra.* Even in *National Geographic*, however, we note that the United States Supreme Court rejected the "slightest presence test" which had been applied by the California Court:

> Our affirmance of the California Supreme Court is not be understood as implying agreement with that court's "slightest presence" standard of constitutional nexus.

430 U.S. at 556, 97 S.Ct. at 1390.

The factual distinctions between the foregoing cases and the instant case are readily apparent. West's activities in the City consist of a single sales representative who solicits orders and forwards them to West's place of business in Minnesota for acceptance, processing and shipment direct to the consumer. Further, West maintains neither an office nor an inventory within the City. Finally, the obligation which the City seeks to impose is a direct tax on West and not simply the duty to collect a use tax which would ultimately be paid by the consumer.

In *State Tax Comm'n. v. Murray Co. of Texas*, 87 Ariz. 268, 350 P.2d 674 (1960), *judgment vacated and case remanded for clarification*, 364 U.S. 289, 81 S.Ct. 53, 5 L.Ed.2d 39 (1960); *second opinion*, 89 Ariz. 61, 358 P.2d 167 (1960), *cert. denied,*

366 U.S. 950, 81 S.Ct. 1903, 6 L.Ed.2d 1243 (1961),[4] our supreme court found that the questioned transactions were interstate in nature and that the seller's other business activities did not convert the sales into intrastate transactions. Therefore, the sales were found to be protected from Arizona's transaction privilege tax by the commerce clause of the United States Constitution. In that case, Murray was a Delaware corporation with its principal place of business in Dallas, Texas, and a branch office in Fresno, California. It manufactured cotton gins and prefabricated steel buildings which it sold in many states, including Arizona. The disassembled gins and buildings were sent to the site and there assembled. The sales contract provided that Murray would provide an expert to supervise the assembly if requested by the customer. Murray's assembly experts lived in Phoenix but were paid by, took directions from and reported to the Fresno office. The court stated: "We perceive nothing of material benefit to [Murray] performed by [its sales representative] different from what he might have performed as an ordinary salesman visiting the state periodically." 87 Ariz. at 271, 350 P.2d at 677.

## CONCLUSION

We conclude that the nexus between West and the City is insubstantial and insufficient to justify the imposition of the privilege license tax in question. The activities conducted by West within the boundaries of the City demonstrate that the City has not offered nor extended any consequential services, protections or benefits for which it can exact the privilege tax.

For the foregoing reasons, the judgment of the trial court is affirmed.

CONTRERAS and EUBANK, JJ., concur.

---

**4.** The appellee's motion to reinstate judgment was granted on February 1, 1960.