837 P.2d 180

TUCSON NEWSPAPERS, INC., an Arizona corporation in dissolution, and TNI Partners, an Arizona general partnership, successor in interest to Tucson Newspapers, Inc., Plaintiffs–Appellants,

v.

The CITY OF TUCSON, a Municipal corporation, Defendant–Appellee.

No. 1 CA–TX 91–0012.

Court of Appeals of Arizona, Division 1, Department T.

Aug. 27, 1992.

---

Lewis and Roca by John P. Frank, Pat Derdenger, Phoenix, for plaintiffs-appellants.

Frederick S. Dean, Tucson City Atty. by Elisabeth Sotelo, Principal Asst. City Atty., Tucson, for defendant-appellee.

## OPINION

McGREGOR, Presiding Judge.

Tucson Newspapers, Inc., and its successor in interest, TNI Partners (collectively "TNI"), appeal from summary judgment entered in favor of the City of Tucson on TNI's claim for a refund of some $4.42 million in business privilege taxes paid for the period April 1, 1984, through December 31, 1987. The appeal requires us to consider (1) whether the City of Tucson's business privilege tax on TNI's gross income derived from notices, subscriptions and local advertising violates TNI's rights under the First Amendment to the United States Constitution and art. II, § 6 of the Arizona Constitution and (2) whether the manner in which Tucson applies the privilege tax to TNI and its competitors violates TNI's right to equal protection of the law under either the federal or state constitution. We find no constitutional violation and therefore affirm the judgment of the trial court.

### I.

Star Publishing and Citizen Publishing jointly own all the shares of Tucson Newspapers, Inc. Effective December 26, 1988, Tucson Newspapers, Inc. transferred its assets and liabilities to TNI Partners, a general partnership between Star Publishing and Citizen Publishing. TNI Partners has continued the business operations of Tucson Newspapers, Inc., publishing the *Arizona Daily Star* and the *Tucson Daily Citizen.* TNI maintains its editorial office and printing facility in Tucson, which licenses TNI under the publishing and retail classifications of Tucson's business privilege tax provisions. Tucson Code §§ 19-435 and 19-460.

TNI derives approximately seventy-five percent of its gross revenue from advertising in the form of "run-of-the-press" ads, printed in the newsprint portion of the newspaper, and advertising supplements, inserted into each newspaper. The remainder of TNI's gross revenue comes from circulation revenue.

Tucson Code § 19-400(a)(1) levies business privilege taxes "upon persons on account of their business activities, to the extent provided elsewhere in this Division, to be measured by the gross income of persons, whether derived from residents of the City or not, or whether derived from within the City or from without." Sections 19-405 through 19-480 enumerate fourteen distinct classifications of business activities subject to taxation. Each is taxed at two percent of gross income. Four of the fourteen classifications are pertinent to this appeal.

Tucson Code § 19-405, "Advertising," taxes the business of "local advertising," which generally includes "delivery or disseminating of information directly to the public or any portion thereof for a consideration...." Section 19-460, "Retail sales," taxes the business of selling tangible personal property at retail, with certain exclusions and exemptions. Section 19-470, "Telecommunication services," taxes the business of providing telecommunication services to consumers within Tucson. Section 19-470(e) specifically exempts "gross income from the providing of telecommunication services by a cable television system...."

Section 19-435, "Publishing and periodicals distribution," taxes the business of publishing newspapers, magazines or other periodicals within the city, measured by the taxpayer's gross income from notices, subscriptions and local advertising. Subsection 2 of § 19-435(a) taxes the business of

distributing or delivering newspapers, magazines, and other periodicals not published in the city, measured by gross income from subscriptions. On April 25, 1988, Tucson's Mayor and City Council added to the Tucson Code new regulations 19–405.2 and 19–435.2, effective retroactively to April 1, 1987, which extended to newspaper and other periodical publishers and distributors the "local advertising" tax imposed by Tucson Code § 19–405.

During the audit period, the City of Tucson imposed taxes under the advertising, publishing and/or retail sales classifications on twelve other publications based in Tucson, including *Tucson Magazine, Tucson Homes Illustrated,* and the *Greater Tucson Apartment Journal.* The City imposed no taxes on nationally circulated publications such as *TV Guide, The New York Times, The Los Angeles Times,* or *The Chicago Tribune,* because none derived gross income from local advertising, subscriptions or job printing, and their sales in Tucson were made by distributors who were themselves taxed under the retail classification.

TNI's principal competitors for advertising revenue, all Arizona publications, include the *Advo Mailer,* the *Daily Territorial,* the *Weekly Territorial,* and the *Arizona Daily Wildcat.*

The *Advo Mailer* is published in Phoenix and has no distribution facility in Tucson. All the *Advo Mailer*'s advertisement orders from the Tucson market are produced, processed and distributed from Phoenix. The *Advo Mailer* derives its gross income from local and nontaxable national advertising, and is subject to the City of Phoenix's business privilege tax.

Territorial Publishing Company ("Territorial"), which publishes the *Daily Territorial* and the *Weekly Territorial,* is located outside Tucson and has no distribution facility in Tucson. Tucson subjects Territorial to business privilege taxation on a *pro rata* share of its income from both subscriptions and advertising, as determined by the percentage of its total circulation distributed within city limits. Territorial pays privilege taxes based on revenues

from publishing the City's own legal notices in the *Daily Territorial,* but has paid no privilege taxes on any other advertising or subscription revenues. The City of Tucson has not audited Territorial.

The *Arizona Daily Wildcat,* the University of Arizona's official student newspaper, falls under the control of the University and the Arizona Board of Regents. It is distributed on campus and in limited off-campus areas free of charge and also has approximately 400 paid subscribers. The *Wildcat* pays no taxes to the City on its subscription or advertising revenues.

TNI also competes for advertising revenue with radio and television stations and cable television systems. Three cable television companies operated in Tucson at various times during the audit period. Cooke CableVision, Inc. currently operates a cable television system in Tucson. Cooke's operating revenues come from subscriptions and from local and national advertising. Cooke pays business privilege taxes to the City on its advertising revenues, but its subscription revenues are exempt from privilege taxation. Tucson Code § 19–470(e). Tucson has not audited Cooke.

TNI has paid its Tucson privilege taxes under protest since July 1983, except for a portion of 1987, when TNI failed to protest due to clerical error. The City audited TNI for the period of April 1, 1984, through December 31, 1987. As a result, the City assessed TNI an additional $58,636.11 on grounds not material to this appeal.

TNI protested the assessment in a petition for administrative review. TNI then amended its petition to protest all taxes it had paid under Tucson Code § 19–435, contending that the ordinance, as applied to newspapers, violated the First Amendment and the Equal Protection Clause of the Fourteenth Amendment and filed an administrative claim for a refund of $4,428,935.22. TNI's administrative challenges were unsuccessful.

Pursuant to Tucson Code §§ 19–570(a) and 19–575, TNI paid the disputed assessment under protest and brought this action in the Arizona Tax Court. On cross-motions for summary judgment, the tax court

ruled in favor of the City of Tucson on all issues. The tax court entered a formal judgment in accordance with its ruling, and TNI timely appealed. We have jurisdiction pursuant to A.R.S. § 12–2101.B. The appeal is assigned to Department T of this court pursuant to A.R.S. § 12–120.04.G.

## II.

■ TNI contends that, as applied, the City's privilege tax on the business of publishing and periodicals distribution violates its First Amendment rights.[1] TNI acknowledges the settled principle that newspapers are subject to all generally applicable laws, including general tax laws. *See Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 581, 103 S.Ct. 1365, 1369, 75 L.Ed.2d 295 (1983); *Giragi v. Moore*, 49 Ariz. 74, 64 P.2d 819 (1937), *reaffirming* 48 Ariz. 33, 58 P.2d 1249 (1936). TNI asserts, however, that Tucson Code § 19–435 is not a generally applicable tax law, but applies only to one large publisher, TNI, on the income from only two newspapers, the *Arizona Daily Star* and *Tucson Daily Citizen*. According to TNI:

> [T]he City has singled out the press for differential tax treatment by not applying its general sales tax to newspapers. Instead, the City has carved out a special newspaper taxing provision that applies only to publications protected by the First Amendment. While other businesses are taxed on the basis of sales, publications are taxed not only on sales but on revenues wholly apart from sales. In treating the press as equal to other businesses, the City operates within constitutional boundaries; but when it discrimi-

nates against the press, it runs into the First Amendment.

TNI's First Amendment claim is founded on two critical misstatements, one of fact and one of law. First, contrary to TNI's assertion, the publishing and periodicals distribution classification under Tucson Code § 19–435 does not fall on TNI alone, but rather applies to three other publishers located in Tucson[2] as well as to at least one publisher located outside the Tucson city limits.[3]

Second, Tucson Code § 19–435 does not constitute a "special newspaper taxing provision" that the City has substituted for its general retail sales provisions when taxing publications protected by the First Amendment. Contrary to the thrust of TNI's analysis, section 19–435 is essentially a specific application of two other generally applicable provisions of the Tucson Code—the tax on the business of local advertising in section 19–405 and the tax on retail sales in sections 19–460 and 19–465. As the tax court explained:

> The transaction privilege tax is not a sales tax. It is a tax on the privilege of doing business within the taxing jurisdiction, and is measured by the volume of business carried on within the jurisdiction. Each of Tucson's tax classifications is designed to measure the full volume of business transacted within the jurisdiction.
>
> . . . .
>
> . . . [D]istinctions [between businesses] in the tax code are directly related to the type of business activity subject to taxation, and are directed at making the most efficient determination of the business's

1. Effective April 1, 1987, the Mayor and Council of the City of Tucson repealed Article II, Ch. 19 of the Tucson Code, on "business privilege license" taxes, and adopted in its place a version of the "Model Cities Tax Code." The tax court determined that TNI failed to raise the applicability of the former Tucson business privilege license tax provisions before the City's hearing officer, and agreed with the City that the court could not consider TNI's refund claim to the extent it was based on any such provisions. TNI does not challenge this determination in its opening brief, and we therefore limit our analysis of TNI's arguments to the privilege taxing

scheme in effect in Tucson on and after April 1, 1987.

2. *Tucson Homes Illustrated,* published by Photo Journal Press Companies; *Tucson Lifestyle,* published by Old Pueblo Press, Inc.; and *Tucson Guide Quarterly,* published by Madden Publishing, Inc.

3. The *Daily Territorial* and the *Weekly Territorial,* published by Territorial Publishing Company.

gross income from activities which have a nexus with Tucson.

Because newspapers generate income not only from subscriptions, but from advertising and notice publication as well, it is inherently logical that the City chooses to measure a newspaper's volume of business by taking into account all of the newspaper's revenue sources. (Citations omitted.)

The record confirms this analysis. Of thirteen publishers of newspapers or periodicals located in Tucson, Tucson taxes seven under the advertising classification of Tucson Code § 19–405, taxes one under the retail classification of section 19–460, one under both the retail and advertising classifications, and four, including TNI, under the publishing classification of section 19–435.

The United States Supreme Court's decision in *Leathers v. Medlock*, —— U.S. ——, 111 S.Ct. 1438, 113 L.Ed.2d 494 (1991), published after the trial court issued its memorandum ruling in this case, confirms that Tucson Code § 19–435 does not violate TNI's First Amendment rights. In *Leathers*, the Court held an Arkansas statute that imposed a tax on the gross receipts of cable television stations but not on satellite broadcast services did not violate the cable operators' rights under the First Amendment.

The Court found the First Amendment does not prevent a state from imposing its sales tax only on selected segments of the media. It also observed that its prior decisions had held a tax that discriminates among speakers is constitutionally suspect only in certain circumstances. *See Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987); *Minneapolis Star*, 460 U.S. at 575, 103 S.Ct. at 1365; *Grosjean v. American Press Co.*, 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936). The Court concluded:

[D]ifferential taxation of First Amendment speakers is constitutionally suspect when it threatens to suppress the expression of particular ideas or viewpoints. Absent a compelling justification, the government may not exercise its taxing power to single out the press.... A tax is also suspect if it targets a small group of speakers. Again, the fear is censorship of particular ideas or viewpoints. Finally, ... a tax will trigger heightened scrutiny under the First Amendment if it discriminates on the basis of the content of taxpayer speech.

*Leathers*, —— U.S. at ——–——, 111 S.Ct. at 1443–44 (citations omitted).

The Court found that the Arkansas gross receipts tax on the cable television business triggered none of these concerns. Like the Tucson privilege license taxing scheme in question here, the Arkansas tax applied to sales of all tangible personal property and a broad range of services. The tax did not single out the press, nothing indicated Arkansas had targeted cable television in a purposeful attempt to interfere with its First Amendment activities, and Arkansas did not structure the tax to apply only to a narrow group. Finally, the Court determined the Arkansas tax was not content-based.

The Court also held that the Arkansas gross receipts tax did not violate the First Amendment by taxing some media businesses and exempting others, stating that "differential taxation of speakers, even members of the press, does not implicate the First Amendment unless the tax is directed at, or presents the danger of suppressing, particular ideas." *Leathers*, —— U.S. at ——, 111 S.Ct. at 1447. The Arkansas legislature could properly choose to exclude or exempt certain media from a generally applicable, content-neutral sales tax. A sales tax that applies to cable television services, or cable and satellite services, while exempting the print media, does not violate the First Amendment. *Id.*

Applying the tests summarized in *Leathers*, we conclude the Tucson business privilege tax triggers none of the First Amendment concerns. The Tucson privilege taxing scheme does not single out enterprises protected by the First Amendment. Rather, as was true of the tax considered in *Leathers*, its provisions apply to a broad range of business activities in which newspaper publishers engage side by side with

other businesses. Further, nothing in the record or in the Code language indicates that application of section 19–435 to TNI's business activities constitutes an attempt to interfere with the content of TNI's speech.

TNI contends, however, that because section 19–435 affects only a relatively small number of publishing businesses, it "targets a small group of speakers" and therefore violates the First Amendment. *See Minneapolis Star*, 460 U.S. at 591–92, 103 S.Ct. at 1375–76 (tax that targeted small group of newspapers resembled a penalty for certain newspapers). We disagree. Although the number of publishers subject to the Tucson tax is relatively small, the tax does not single out or target a small number within that group. Rather, section 19–435 is a specific application of Tucson's local advertising and retail sales privilege taxes to the publishing and periodicals distribution business and applies to all concerns that fall within its scope.

As the Virginia Supreme Court pointed out in considering a similar argument, to accept the argument that a tax violates the First Amendment because only a small number of enterprises fall within the taxing category

> would virtually eliminate the ability of local governments to raise operating revenues through general taxation ordinances whenever there happened to be a single, or only a few, enterprises engaging in First Amendment activities. If, for example, a city had a single magazine, subjecting the sales of magazines to a sales tax would ... violate the First Amendment. In contrast, no such violation would exist if the state applied a sales tax to all magazines because a greater number existed statewide. The number of First Amendment speakers affected is not, in our opinion, the test established in *Leathers*. To be constitutionally suspect, the taxation scheme must be "structured so as to raise suspicion that it was intended to [interfere with First Amendment activities]." *Leathers*, —— U.S. at ——, 111 S.Ct. at 1444.

*Cox Cable Hampton Roads v. Norfolk*, 410 S.E.2d 652, 655 (Va.1991).

We conclude Tucson's privilege tax on the business of publishing and periodicals distribution does not target a small group of speakers and is not structured or used to interfere with First Amendment activities. The tax court therefore correctly held that Tucson Code § 19–435 does not violate TNI's First Amendment rights.

### III.

■ TNI also argues that Tucson's privilege tax on the business of publishing and periodicals distribution violates its right to equal protection under the Fourteenth Amendment. Because the challenged tax statutes do not impair a fundamental right, we will uphold the statute if it is reasonably related to a legitimate governmental interest. *Arizona Downs v. Arizona Horsemen's Found.*, 130 Ariz. 550, 555–56, 637 P.2d 1053, 1058–59 (1981). We presume a tax statute is constitutional, *J.C. Penney Co., Inc. v. Arizona Dep't of Revenue*, 125 Ariz. 469, 472, 610 P.2d 471, 474 (App.1980), and measure the legislation against an equal protection challenge with several basic principles in mind:

> "Classifications embodied in municipal licensing legislation must be based upon intrinsic, natural and reasonable distinctions germane to the police or revenue purpose of the law. The difference between the subjects need not be great; and if any reasonable distinction can be found to exist, the classification imposed by the licensing laws will be sustained. The classifications may reasonably distinguish between business or trades or between different methods of conducting the same general character of business or trade * * * It is inherent in the exercise of power to license or tax that a state or municipality, duly authorized by the state, be free to select the subject of taxation and to grant exemptions. *Neither due process nor equal protection imposes upon a state any rigid rule of equality of taxation....* If no abuse appears, and especially in doubtful cases,

courts will not interfere with a licensing classification."

*Kaufman v. City of Tucson,* 6 Ariz.App. 429, 432, 433 P.2d 282, 285 (1967) (quoting 9 McQuillan on Municipal Corporations § 26.60 at 142 (rev. 3d ed.)). Particularly when considering local economic regulation, the courts defer to legislative determinations that distinguish between different trades and businesses. *Regan v. Taxation with Representation of Washington,* 461 U.S. 540, 547–48, 103 S.Ct. 1997, 2001–02, 76 L.Ed.2d 129 (1983). "The burden is on the one attacking [tax legislation] to negate every conceivable basis which supports it." *Leathers,* —— U.S. at ——, 111 S.Ct. at 1446.

TNI argues first that Tucson Code § 19–435 is inherently discriminatory because it taxes in-city and out-of-city publishers differently. Section 19–435, standing alone, does tax in-city publishers on gross income derived from notices, subscriptions and local advertising, and out-of-city publishers only upon gross income derived from subscriptions. Effective April 1, 1987, however, new Tucson Code regulations 19–405.2 and 19–435.2 extended the local advertising tax of section 19–405 to publishers and distributors of newspapers and other periodicals.[4] Regulation 19–435.2 thus effectively amended section 19–435 to include within the privilege license tax a *pro rata* share of out-of-city publishers' gross income from local advertising as well as from subscriptions.

Contrary to TNI's argument, Tucson's tax regulations constitute legislative enactments of the City and therefore constitute part of the Tucson Code. *See Lincoln Property Co. v. City of Tucson,* 131 Ariz. 473, 475–76, 641 P.2d 1317, 1319–20 (App. 1982). We therefore find no support for TNI's assertion that the Tucson Code impermissibly discriminates among newspaper publishers based on the geographic location of their publishing operations.

TNI further contends that Tucson Code § 19–435 violates its rights under the equal protection clause because it taxes TNI's advertising revenue but does not tax advertising revenue received by publications such as the *Advo Mailer,*[5] which is taxed as an advertiser rather than a publisher due to the nature of its principal business. *Advo Systems, Inc. v. Arizona Dep't of Revenue,* CCH Arizona Tax Reports, ¶ 200–865 (1989). As the tax court observed, the *Advo Mailer* is published in and taxed by the City of Phoenix. It maintains no distribution facilities in Tucson, and prepares all its Tucson advertising copy in Phoenix. During the time period at issue, the law required a substantial nexus between a business enterprise and a city to justify that city's imposition of a privilege tax. *City of Phoenix v. West Publishing Co.,* 148 Ariz. 31, 712 P.2d 944 (App.1985); *see also National Bellas Hess, Inc. v. Dep't of Revenue of Illinois,* 386 U.S. 753, 87 S.Ct. 1389, 18 L.Ed.2d 505 (1967), *overruled in part by Quill Corp. v. North Dakota,* —— U.S. ——, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992). The City of Tucson had "not offered nor extended any consequential services, protections or benefits ..." to the *Advo Mailer. See West Publishing,* 148 Ariz. at 36, 712 P.2d at 949. The City, therefore, had a reasonable basis for concluding the *Advo Mailer* was not a member of the class of taxpayers to which TNI and other Tucson-based publishers belong and that Tucson could not levy a business privilege tax consistent with due process.[6] For similar reasons, the City's failure to levy its privilege tax on non-local advertising revenues of the *Los Angeles Times, TV Guide* and other out-of-state publications is not objectionable under the equal protection clause.

---

4. As we observed *supra* at n. 1, this appeal does not comprehend any issues concerning Tucson Code taxing provisions in effect before April 1, 1987.

5. Unlike the TNI publications, the *Advo Mailer* consists of direct mail advertising fliers.

6. Confined as we are to considering the period from April 1 to December 31, 1987, we do not consider the impact of the recent Supreme Court decision in *Quill Corp. v. North Dakota,* —— U.S. ——, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992), upon Tucson's application of its business privilege tax.

We also reject TNI's contention that the Tucson business privilege tax violates its equal protection rights because it taxes TNI's subscription revenues but not those of cable television systems such as Cooke CableVision. The Supreme Court disposed of this argument in *Leathers*, in which the Court held a state or municipality may choose to exclude or exempt certain media from a generally applicable tax and may, for tax purposes, distinguish between television and the print media. *Leathers*, —— U.S. at ——, 111 S.Ct. at 1447; *Chesterfield Cablevision, Inc. v. County of Chesterfield*, 241 Va. 252, 401 S.E.2d 678 (1991) (privilege tax on cable television that exempted newspapers and broadcasters sustained against equal protection challenge).

We also reject TNI's final contention that Tucson's failure to tax the advertising revenues of the *Arizona Daily Wildcat* violates its equal protection rights. We agree with the tax court that, although the *Daily Wildcat* is not specifically exempted from the tax code, Tucson could reasonably conclude that because it "is a publication under the operation and control of the State Board of Regents, the doctrine of state sovereignty prevents the city from collecting the tax."

### IV.

For the foregoing reasons, we affirm the judgment of the trial court.

LANKFORD and EHRLICH, JJ., concur.